HARDY (COOPER v.).    See Case No. 3,196.

## Case No. 6,059.

### HARDY et al. v. HARBIN et al.

### [1 Sawy. 194.] [1]

Circuit Court, D. California.    June 21, 1870.[2]

PATENT FOR MEXICAN GRANTS—PURCHASERS FROM PATENTEE.

Where a bill was filed by the alleged heirs of a deceased Mexican grantee of a ranch against certain persons who had purchased from a party to whom the land had been confirmed and patented, to compel a transfer of the estate purchased, and a delivery of the patent and other muniments of title to the complainants, and it appeared that the patentee derived title under a sale made by order of the probate court which under the decisions of the supreme court was without jurisdiction to order the sale, and it further appeared that the defendants were bona fide purchasers for full value, from the patentee and had no actual notice of any defects in the deraignment of his title from the original grantee: *Held*, that the recitals in the patent that the claim was founded on a Mexican grant; that it had been confirmed by the board and the district court; and that the patent did not affect the rights of third persons, did not affect the defendants with constructive notice of the transcript and records of the board and of the district and of the proceedings in the probate court and the administrator's sale which those records described, and further that their omission to take notice of those proceedings and that the administrator's deed was a nullity was not an act of crassa negligentia or "an omission to take a reasonable and well established precaution which should be treated as equivalent thereto."

[Cited in Parkhurst v. Hosford, 21 Fed. 835.]
[See note at end of case.]

[This was a bill in equity by Alexander Hardy, Thomas Botham, and Ellen Hardy Botham against James M. Harbin, George Taylor, J. C. Parrish, and others.    See Case No. 6,060.]

W. W Chipman and B. S. Brooks, for complainants.

J. B. Harmon, for defendants.

HOFFMAN, District Judge.    The complainants in this case are the children of one John

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]
[2] [Affirmed in 154 U. S. 598, 14 Sup. Ct. 1172.]

Hardy, a native of Canada, who, it is alleged, left that country in 1832, and after various wanderings arrived in California, where, having become a Mexican citizen, and assumed the name of Thomas M. Hardy, he obtained from Governor Micheltorena a grant of the premises in controversy.    This grant is dated October 23d, 1843.

In October, 1848, Hardy died, leaving no heirs or relatives residing in this state. One Stephen Cooper, to whose house Hardy's body had been carried from the rancho at which he had died, and who had buried him, thereupon applied to C. P. Wilkins, then acting as prefect, to be appointed as administrator of Hardy's estate. Letters of administration were accordingly issued to him on the twenty-seventh day of March, 1850.

On the twelfth March, 1851, Wilkins, whose office had previously been abolished, transferred the papers and documents in the case to the then recently organized probate court. Soon afterward, the probate court, on the petition of the administrator, made an order for the sale of the real property of the deceased, and it was accordingly sold for the sum of $6,000. The sale was confirmed by the probate court, and in July, 1851, a conveyance was executed by the administrator to the purchaser.

In 1852, the claim of the purchasers and parties deriving title from them, was presented to the board of commissioners for confirmation. In July, 1855, the claim was confirmed by the board, and in March, 1857, by the district court on appeal. This decree having been made final by consent of the attorney-general of the United States, a patent was issued to the claimants in July, 1858. The defendants claim title under the patent by conveyances subsequent to its date, with the exception of two or three who obtained their deeds after the final confirmation, but before the patent issued.

The complainants insist, that the prefect of the district of Sonoma had no jurisdiction over the estate of Hardy, or authority to appoint an administrator thereof; that all acts under color of such appointment are null and void, and that the probate court of Solano county acquired no jurisdiction by the transfer to it, by the prefect, of the papers in the case.

They also insist, that even if the probate court acquired any jurisdiction over the estate, it never acquired jurisdiction to order a sale of the real property of the decedent, by reason of various defects and omissions in the petition and proceedings for the sale, which the bill sets forth; and also, that the sale was vitiated by fraudulent practices on the part of the administrator and purchaser, which the bill details at length; that the whole proceeding was the result of a fraudulent conspiracy against the rights of the absent heirs of Hardy; and that the defendants had notice of these frauds before they acquired their respective interests.

The bill further alleges, that the complainants never received any intelligence of their father after he left the Mississippi river, in 1833 or 1834, except by a letter written from Monterey in 1847 or 1848, and until within the last three years had no information as to his residence or movements, or of the acquisition by him of the property, or of the various proceedings relating to the same, set forth in the bill.

They ask, therefore, that the defendants may be charged as the trustees of the title of the real estate, to the extent of the several interests held by them, for the benefit of the complainants, and. that they may be decreed to transfer the same to them, and deliver up the patent and all other muniments of title connected with the property.

The defendants, at an earlier stage of the cause, interposed a demurrer to the bill, which, after argument, was overruled by the presiding judge of this court, on the ground that the patent, which was presumed to contain the usual recitals, was a constructive notice to all who purchased under it, of the fact, that the patentees deraigned title through a sale by an administrator, and that they were thus put on inquiry, and charged with notice of the invalidity of that sale, and the nullity of the proceedings which led to it. [Case No. 6,060.]

The demurrer having been overruled, an answer was put in, which, in substance, denies that John Hardy, of Canada, was the same person as Thomas M. Hardy, of California; denies the alleged frauds; denies all knowledge or notice on the part of the defendants of such frauds, if they were committed, and all knowledge or notice of the invalidity of the proceedings in the probate court. On the issues so made, a vast number of depositions have been taken; elaborate arguments were heard, and the cause now comes up for final determination.

The evidence in support of the charges of fraud is unsatisfactory and inconclusive; no attempt whatever was made to sustain by proofs the greater part of the allegations of the bill, which state the facts and circumstances constituting the imputed fraud. So far as appears, the judge acted under the belief that the probate court possessed jurisdiction to order the sale, and that the proceedings were regular and fairly conducted. The order confirming the sale recites that "the confirmation was objected to, and that the court thereupon proceeded to examine and hear all proofs introduced relative to said sale; and that it appeared to the court by proof made in open court that notice of the sale had been given, by publication in a newspaper, and posting up notices as prescribed in the statute; that the sale was legally made in pursuance of the order of the court, and that it was in every respect fairly conducted; and that a greater sum than the amount specified in said report as having been bid cannot be obtained. It is therefore adjudged that the objections to the confirmation of said report be overruled, and that the same be confirmed," etc.

The only evidence against the truth of these recitals, is the testimony of a few persons who assert that they attended at the place of sale designated in the notices, and finding no one, returned; but that the sale in fact took place at a spot some twelve miles distant, and that had they been present they would have been prepared to bid a larger amount than was obtained. Some evidence is also offered to show that a party who attended the sale was in some way induced not to bid.

But these circumstances, even if true, are wholly insufficient to sustain the charges in the bill, of a fraudulent and corrupt conspiracy between the probate judge, the administrator and the purchasers at the sale. The notices of sale are not produced, nor is there a particle of evidence to show that either the judge or the administrator had any interest in or derived any benefit from the purchase.

Without dwelling longer on the evidence, it is sufficient to say that the complainants have failed to establish this part of their case. But even if the fact were otherwise, it is clear that they have not succeeded in bringing home to the defendants actual notice of the alleged frauds. The latter were aware that the land had been granted to Hardy, and that it had been sold at an administrator's sale—but of the invalidity of that sale by reason of frauds perpetrated by the judge, the administrator and the purchasers, or by reason of the want of jurisdiction in the court, none of them seems to have been advised.

The circumstances of the case compel the complainants to admit a superior title in the defendants as holders of the legal estate under the patent, and to avoid it by an allegation of fraud and notice of their equities. The burden is therefore on them to aver and prove the fraud and the notice (Center v. Bank. 22 Ala. 743), and the defendants will have the advantage of requiring that their account of the matter should be received as true, unless conclusively disproved. 1 Litt. [Ky.] 42; 7 J. J. Marsh. 301; 3 Gill & J. 425; cited in 2 Hare & W. Lead. Cas. p. 126.

It will not be pretended that the mere knowledge that the land had been originally granted to Hardy, and that the patentees deraigned title through an administrator, could have any effect to charge the defendants with notice of any fraudulent proceedings in effecting the sale. They could at most be affected with notice of what the record of the probate court disclosed—or of the absence of jurisdiction in the court over the estate sold. Whether they were charged with notice even to this extent will be hereafter considered. But of frauds in fact the record disclosed nothing—on the contrary, the judgment of the court declared that the

sale had been duly advertised, fairly conducted, and was for an adequate price.

In the very elaborate arguments of the counsel for the complainants, but slight allusion was made to the evidence in support of the charges of fraud and actual notice. That part of the case seemed to be virtually abandoned. I dismiss it, therefore, from further examination, and proceed to consider the important and novel questions with respect to constructive notice, presented in the case.

It is not denied that the supreme court of this state has decided that the statute for the settlement of the estates of deceased persons has no application to the estates of parties who died previously to the organization of the state government. Grimes v. Norris, 6 Cal. 621; Tevis v. Pitcher, 10 Cal. 466; Downer v. Smith, 24 Cal. 114.

The proceedings, therefore, in the probate court of Solano county were a nullity, and the deed of the administrator conveyed no title whatever to the purchasers at the sale. On the other hand, it appears that the defendants are the holders of the legal estate, under the patent of the United States; that they purchased from parties who were and had long been in the actual, notorious, undisputed and exclusive possession of the land; that they paid full value for their respective purchases; and that they had no knowledge of any alleged frauds on the part of those from whom they derived title, or of the invalidity of the proceedings in which that title originated. They are thus innocent, bona fide purchasers for value, and without notice except so far as, under the circumstances of the case, they are charged with constructive notice.

The question thus presented is of great importance. Its determination may affect the rights of all persons who may have purchased from the patentees of confirmed land claims in this state. It is also, I believe, novel; for it arises, not as heretofore between the patentees and the representatives of the original grantee, but between those representatives and purchasers from the patentees, after the confirmation of their claim, and the issuance to them of a patent conveying the legal title previously outstanding in the United States.

In the opinion rendered by Mr. Justice Field, when overruling the demurrer in this case, it is assumed that the patent was in the usual form, "with a recital of the existence of the grant, the conveyance of the grantee's interest by the administrator, the confirmation of the claim under the grant, the survey upon the confirmation, and the approval of the survey," etc. The patent was not at that time submitted to the inspection of the court. In fact, it contains no recitals with respect to the grant or the title of the patentees, except that they presented a claim for the rancho of Rio de Jesus Maria, founded on a Mexican grant, made by Gov. Micheltorena on the twenty-third day of October,

1843; that this claim was confirmed by the board of land commissioners and by the district court; that the judgment, on appeal of the district court, was made final by stipulation. A survey was made, duly approved and certified to by the commissioners of the general land office. The patent does not even refer to the original grantee, still less to any of the conveyances by which the patentees deraigned title. For aught that appears on the face of the patent, the patentees might have been the original grantees of the land.

It is contended, however, that the patent refers to and recites a Mexican grant; to proceedings upon this grant before the board and the United States district court, that it mentions the name of the rancho, the date of the grant, and by whom granted; and that it contains an express stipulation, in accordance with the statute, that the interests of third persons shall not be affected thereby; that the purchasers from the patentees were thus directed to the source of title of the latter, and were bound to take notice of the records of the board of land commissioners, and especially of the transcript and records of the district court; and that these, if consulted, would have disclosed the fact that the patentees claimed title under an administrator's deed which was a nullity.

The general doctrine is well settled, that the purchaser of a legal title will be liable to all equities of which he had actual or constructive notice at the time of the purchase; for by taking the legal estate, after notice of a prior right, he becomes a mala fide purchaser. LeNeve v. LeNeve, 3 Atk. 647–649.

But a purchaser bona fide, without notice of any defect in his title at the time of the purchase made, may (as is said by Lord Nottingham, in Bassett v. Nosworthy, Cas. t. Finch, 102) "lawfully buy in a statute, or mortgage, or any other incumbrance; and if he can defend himself at law by any such incumbrances bought in, his adversary shall never be aided in a court of equity by setting aside such incumbrances; for equity will not disarm a purchaser, but assist him. And precedents of this nature are very ancient and numerous, where a court hath refused to give any assistance against a purchaser, either to an heir, or to a widow, or to the fatherless, or to creditors, or even to one purchaser against another."

In Jones v. Powles, 3 Mylne & K. 581, a person who had advanced money upon a mortgage of an estate which the mortgagor claimed under a will, which turned out to be forged, got a conveyance of the legal estate which was outstanding in a mortgagee whose debt had been satisfied. Upon a bill filed by the heiress-at-law, it was held that the mortgagee being a purchaser without notice of the plaintiff's title could protect himself by the legal title. And Sir John Leach, M. R., says: "Upon full consideration of all the authorities which have been referred to, and the dicta of judges, and text-writers,

and the principles on which the rule is grounded, I am of opinion that the protection of the legal estate is to be extended not merely to cases in which the title of the purchaser for valuable consideration without notice was impeached by reason of a secret act done, but also to cases in which it is impeached by reason of the falsehood of a fact of title asserted by the vendor, or those under whom he claims, where such asserted title is clothed with possession, and the falsehood of the fact asserted could not have been detected with reasonable diligence."

What will amount to this "reasonable diligence," and when the purchaser will be affected by constructive notice, will depend on the circumstances of each case. "It is scarcely possible," says Vice-Chancellor Wigram, "to declare, a priori, what shall be deemed constructive notice, because unquestionably that which will not affect one man may be abundantly sufficient to affect another. But I believe I may, with sufficient accuracy for my present purpose, and without danger, assert that cases in which constructive notice has been established resolve themselves into two classes, first: * * * and secondly: where the court has been satisfied, from the evidence before it, that the party charged had designedly abstained from inquiry for the very purpose of avoiding notice. * * * The proposition of law upon which the second class of cases proceeds is, not that the party had incautiously neglected to make inquiries, but that he had designedly abstained from such inquiries for the purpose of avoiding knowledge—a purpose which, if proved, would clearly show that he had suspicion of the truth, and a fraudulent determination not to learn it. If, in short, there is not actual notice that the property is in some way affected, and no fraudulent turning away from a knowledge of facts which the res gestae would suggest to a prudent mind—if mere want of caution, as distinguished from fraudulent and willful blindness, is all that can be imputed to the purchaser, there the doctrine of constructive notice will not apply; there the purchaser will be considered, as in fact he is, a bona fide purchaser without notice." 1 Hare, 55, cited; 2 White & T. Lead. Cas. Eq. (Hare & W. notes). The same principles are recognized by the supreme court of the United States in the last decision on this subject.

In Wilson v. Wall [6 Wall. (73 U. S.) 83] the court says: "On this point, we need only refer to Sugd. Vend. (page 622), where he says: 'In Ware v. Lord Egmont [4 De Gex, M. & G. 458] the Lord Chancellor Cranworth expressed his entire concurrence in what on many occasions of late years had fallen from judges of great eminence on the subject of constructive notice, namely: that it was highly inexpedient for courts of equity to extend the doctrine. When a person has not actual notice, he ought not to be treated as if he had notice, unless the circumstances are such as to enable the court to say, not only that he might have acquired, but also that he ought to have acquired it, but for his gross negligence in the conduct of the business in question. The question, then, when it is sought to affect a purchaser with constructive notice, is, not whether he had the means of obtaining and might by prudent caution have obtained the knowledge in question, but whether the not obtaining it was an act of gross or culpable negligence.'" [U. S. v. The Watchful] 6 Wall. [73 U. S.] 91.

The doctrine of constructive notice has unquestionably been carried, in some of the cases, further than the principles above laid down would warrant. They would probably at the present day be otherwise decided. In general, it may be said, that whatever is sufficient to put a person upon inquiry, is good notice; that is, where a man has sufficient information to lead him to a fact, he shall be deemed cognizant of it.

Thus, the direct statement to a purchaser, of an adverse claim, by the party holding it, or by any one acting in his behalf, will take effect as actual notice. But it must be sufficiently definite to put the purchaser on his guard, and enable him to ascertain whether it is authentic. 4 Cushm. 312; Flagg v. Mann [Case No. 4,847]. But mere reports and allegations, incapable of being traced to any definite source, vague and general assertions, resting on mere hearsay, and made by strangers, may be wholly disregarded. 25 Me. 484.

It has even been said that the notice will not be binding unless it proceeds from a person interested in the property, and in the course of a treaty for its purchase. 2 Sugd. Vend. 451, 452; Barnhart v. Greenshields, 28 Eng. Law & Eq. 77. So, also, where the purchaser knows that the legal estate is in a third person, he is bound to take notice of what the trust is. Freem. Ch. 171. Or, if he knows that the title deeds are in another man's possession, and he omits all inquiries as to the deeds, he will be held to have notice of any claim of the party holding them. 9 Hare, 458; 11 Jur. 527; 2 White & T. Lead. Cas. Eq. p. 139. So, too, if the purchaser knows the estate to be in the occupation of another than the vendor, he is bound by the equities which the party in possession may have in the land. Taylor v. Stibbert, 2 Ves. Jr. 439; Jones v. Smith, 1 Hare, 60. So, too, "where the purchaser cannot make out title but by deed which leads him to another fact, he shall be presumed cognizant thereof, for it is crassa negligentia that he sought not after it." Moore v. Bennett, 2 Ch. Cas. 246.

It is also said to be well established, that "a purchaser will have constructive notice of anything which appears in any part of the deeds or instruments which prove and constitute the title purchased, and is of such a nature, that if brought directly to his knowledge, would amount to actual notice." and the rule is said to be the same with re-

gard to grants made by the public as to those made by individuals, and a party claiming title originating in a patent from the state, will be held to have notice of everything that appears on the face of the patent. 2 White & T. Lead. Cas. Eq. p. 169; citing Brush v. Ware, 15 Pet. [40 U. S.] 93.

In that case, the contest was between the real owner of a land warrant and a purchaser of the warrant under a fraudulent executor's sale, who had subsequently obtained a patent. The court held that, in purchasing the warrant, he had merely acquired an equity, and that the recital on the face of the warrant of the assignment by the executor put him on inquiry to inspect the will, and ascertain the validity of the assignment, and that the issuance of the patent by the ministerial officers of the government did not better his position.

What would have been the rights of a purchaser for value without actual notice from the patentee in possession, was not considered. From the foregoing it may be gathered "that although to deprive a purchaser of protection as a bona fide purchaser without notice, he must be proved to have acted fraudulently, or to have been guilty of gross or culpable negligence, yet that the failure to take certain well established and reasonable precautions—such as a thorough examination of title papers, a search of the records, an inquiry into the rights of those in actual possession—will be treated as gross negligence, and will make the purchaser liable for all the consequences of omissions, which are equally injurious whether they proceed from laches or design." 2 White & T. Lead. Cas. Eq. 163.

Such being the general principles applicable to this case, we will proceed to consider the questions presented by it.

1. Did the recitals in the patent that the claim was derived from a Mexican grant; that it had been confirmed by the board and the district court, and that the patent did not affect the rights of third persons, affect the defendants, who purchased for full value from the patentees, in actual and undisputed possession, with notice of the transcript and records of the board and of the district court, and of the proceedings in the probate court, and the administrator's sale, which those records described?

2. If so, were they bound to take notice of the invalidity of those proceedings, and that the administrator's deed was a nullity, and was their failure to learn that fact an act of crassa negligentia, or "an omission to take a reasonable and well established precaution," which may be treated as equivalent thereto?

The cases of Estrada v. Murphy, 19 Cal. 250; Salmon v. Symonds, 30 Cal. 301; and Wilson v. Castro, 31 Cal. 420, are cited in support of the affirmative of the above propositions. But in neither of these cases did the questions here presented arise. Estrada v. Murphy merely holds that where a confirmee, in presenting his claim acts as agent, trustee,

guardian, or in any other fiduciary capacity, equity will compel a transfer of the legal estate to the equitable owner, and will control the legal title in the hands of the patentee, so as to protect the just right of others. Salmon v. Symonds decides that patentees who did not own or claim to own but a portion of a rancho for which they presented their claim, but who have obtained a patent for the whole, will be decreed to hold the legal title for the part not owned by them in trust for the owner. In Wilson v. Castro it was held that where the widow of a deceased Mexican grantee, together with her second husband, conveyed the lands granted to a purchaser, who presented his claim and obtained a patent, equity will raise a constructive trust in favor of the heirs of the deceased grantee. But the court is careful to withhold any expression of opinion as to what, under such circumstances, would be the rights of a purchaser from the patentee without actual notice.

It has already been observed that in Brush v. Ware, 15 Pet. [40 U. S.] 111, the contest was between the patentee and the real owners of the warrant under which the patent issued. The rights of the bona fide purchasers from the patentee were not in question. The law on the points under consideration being thus found not to have been settled by authority, must be determined upon principle. If the purchaser from the patentees was bound to look at the record of the proceedings before the board, and the district court, and the deeds it referred to, and was affected with notice of every defect in the deraignment of the title of the patentees, it can only be because no greater effect is attributed to the adjudication of the courts that the patentees had established a valid claim to the land, than would be given to a declaration to that effect by an ordinary vendor.

The adjudication would, in that case, merely amount to a judicial determination that the original Mexican grant was valid, but would have no effect to raise a presumption that the confirmee was entitled to the patent, strong enough to protect a purchaser from him without notice, or to prevent the failure of the latter to investigate the derivative title from being an act of gross and culpable negligence.

Such is not, in my opinion, a just construction of the provisions of the act of 1851 [9 Stat. 632], under which the patent issued. By the eighth section of that act, "each and every person claiming lands by virtue of any right or title derived from the Spanish or Mexican government, was required to present the same," etc. By section 13, "all lands, the claims to which shall not have been presented to the said commissioners within two years after the date of the act, are to be deemed, held and considered as part of the public domain of the United States. A subsequent clause in the same section provides for the

issuance of an injunction by the district judge to restrain the confirmee from suing out a patent, when his title to the lands confirmed is disputed by any other person.

It will be seen from these provisions that the duty of the board, and of the district and supreme courts, on appeal, was not merely to inquire into the validity of the original grant, but into the validity of the claim of the claimant. If the latter failed to establish, prima facie at least, his derivative title, his claim must be rejected.

In practice, the claims were in general presented in the names of the owners, and not of the original grantees, in cases where the latter had conveyed the whole or a portion of the ranchos; and it has occasionally happened that a claim for a part of a rancho has been duly presented and confirmed, while the remainder has become public land by reason of the non-presentation of any claim for it.

It was therefore, the duty of the law agent, the district attorney, and the attorney-general, and of the board and the courts, to look into the mesne conveyances to a certain extent at least; first, in order that the patent might not issue, except to one presumptively entitled to it; and second, because if the claimants' title could be shown to be invalid, and no other claim had been presented, the land would become a part of the public domain.

The provision in the thirteenth section, for an injunction to restrain the confirmee from suing out a patent, seems to recognize that the issuing of a patent might confer some rights, and raise to some extent a presumption in favor of his title. The form of decree sanctioned by the supreme court, in cases where the derivative title of the claimant was doubtful. seems also a recognition of the same fact.

In those cases, the claim was confirmed to the claimants, or whoever might be the lawful successor in interest of the original grantee. To what end insert this saving clause, if the adjudication in favor of the claimant was so mere a nullity, that not even a bona fide purchaser of the legal title, without actual notice, would be relieved of the imputation of gross negligence if he omitted to search into the derivative title, and if he failed to discover flaws in it which had escaped the notice of the law officers of the United States, and even of the supreme court itself? Nor are the observations of the supreme court, in Castro v. Hendricks, 23 How. [64 U. S.] 441, when properly understood, inconsistent with this view.

The court says: "The mesne conveyances were also required, but not for any aim of submitting their operation and validity to the board, but simply to enable the board to determine if there was a bona fide claimant before it under a Mexican grant; and so this court has frequently decided that the government had no interest in the contest between persons claiming ex post facto the grant."

The supreme court could not, of course, have meant that the government had no interest in showing that the derivative title of the claimant was wholly void; for by so doing the rejection of the claim must have followed, and the lands would in many instances have been secured to the public. All that the court meant to declare was, that the United States had no interest in contests inter partes; that their rights were not submitted to the board, and could not be finally adjudicated, for contestants were not permitted to intervene in the proceeding (except by way of injunction, as provided for in the thirteenth section), and the decision of the board was declared by law not to affect the rights of third persons. The true meaning of the court is, doubtless, that attributed to it by Mr. Justice Baldwin, in Estrada v. Murphy, 19 Cal. 274. "It would seem to follow," says the learned judge, "from these and not less decisive intimations, in other cases in the supreme court of the United States, that the mere fact that a particular person obtained a patent from the government, was not conclusive of his exclusive right, but that it might be shown in a proper proceeding that others were interested or had a better right."

In the opinion delivered by Mr. Justice Field, when overruling the demurrer in this case, it is said: "It (the patent) is evidence that the title had passed by grant from the former government, or that such equities had existed under the former government in favor of the alleged grantee as to require or justify the cession of the title, and also, that by conveyances regular on their face, the legal title had apparently passed from the grantee to the claimants; but it is not evidence of any equitable relations of the holders of subsequent conveyances from the grantee to each other, for such relations were not submitted to the tribunals of the United States for adjudication."

From the foregoing it results, that a confirmation and patent establish: 1st. That the original grant was valid, and 2d. That the patentee has been found to be a bona fide claimant under the grant, and that, by a deraignment of title regular on its face and prima facie valid, he has shown himself to be entitled to a conveyance by the United States of the legal title.

The purchaser, therefore, from the patentee, without actual notice, has a right to assume the existence of these facts thus judicially established. He cannot be charged with gross negligence, willful ignorance, or even neglect of a reasonable and well established precaution, if he has acted upon the belief, that in the mesne conveyances adjudged to be regular and apparently translative of title. there would not be found a deed void on its face. because it was the result of a legal proceeding which was an absolute nullity.

In charging every patentee with a constructive trust in favor of the successor in interest of the grantee, who has failed to present his claim, irrespective of any question of notice, good faith, or any fiduciary relation towards the latter, the supreme court of the state has gone as far as either principle or sound policy will permit. The doctrine of constructive notice should not, in my judgment, be extended contrary to the tendency and spirit of the recent decisions to a new class of cases. It is essential to the security and repose of a vast number of fairly acquired titles in this state, that the rights of the purchaser who, without actual notice, has obtained the legal title from the United States under a patent, should be firmly upheld.

It is well settled, that even where a purchaser is put on inquiry, all that can be exacted of him is a diligent effort to ascertain whether the purchase will prejudice the equitable rights of others; when such an attempt has been made, and it appears that further efforts would have been ·fruitless, the purchaser's duty is discharged. Williamson v. Brown, 15 N. Y. 354; 2 White & T. Lead. Cas. Eq. 154.

In this case, no examination of the record would have in fact apprised the purchaser that the probate court was without jurisdiction over the estate of the deceased. One of the defendants swears that he consulted a lawyer, who advised him that the purchase was safe, and such would very possibly have been the opinion of a large number of the profession.

The decision of the supreme court, that the probate court was without jurisdiction, was not promulgated until several years later. So far, then, as the doctrine of constructive notice rests upon voluntary ignorance or willful blindness, or any moral delinquency whatever, it cannot apply to these defendants: for they had practically and in point of fact no means of ascertaining the fact, with constructive notice of which they are now sought to be charged. If the case of Jones v. Powles, above cited, be law, and if a purchaser of an estate claimed under a forged will, will be protected by the subsequent acquisition of the bare legal title, on the ground, that the falsehood of the asserted fact of title could not have been detected by reasonable diligence, a fortiori must these defendants be protected: for no diligence would have enabled them to discover the defects in the title, unless, in advance of the public and many of the legal profession, and with greater acuteness than was exhibited by the judicial authorities of the United States, they had anticipated a decision of the supreme court of this state upon a novel and perhaps doubtful question of law. Nor could they suspect, that by acquiring the legal title, they were prejudicing the equitable rights of others: for no heirs had appeared to claim the inheritance for more than ten years, and none were known to exist. And besides,

their rights as against the United States had long since been lost, by their failure to present their claim: for the act of 1851 makes no exception in favor of absentees, minors, or femmes covert.

The only party that could have been injured by the presentation of the invalid claim was the United States—and they by a solemn adjudication, final and conclusive as between them and the claimants, had adjudged the claim to be valid, and had issued a patent for the land.

Nor in considering the hardships of this and similar cases, and the comparative equities of the complainants and defendants, is it to be forgotten that but for the proceedings now claimed to have been fraudulent and invalid, no claim would have been presented for this vacant inheritance, and it would long since have been disposed of as public land.

The complainants therefor seek to avail themselves of the acts of the patentees who presented the claim, obtained a confirmation, and procured a patent. It is but just that their rights should be postponed to those who, in good faith and relying upon a deed from the government, the paramount source of title, have paid their money, occupied and improved the land, and for many years have established their homes upon it.

No distinction can, I think, be drawn in this case between those who purchased after confirmation and before patent issued, and those who purchased subsequent to the patent. Both hold the legal title, derived from the United States, under the patent—and both have the equitable right to protection. Under this view, it becomes unnecessary to consider the other important questions of fact and of law presented by the case. The bill must be dismissed.

[NOTE. An appeal was then taken to the supreme court by the plaintiffs, and the judgment was affirmed in an opinion by Mr. Justice Hunt, who said that there was not sufficient evidence to hold that John Hardy and Thomas Hardy were the same person. 154 U. S. 598, 14 Sup. Ct. 1172.]